United States Courts
Southern District of Texas
FILED

June 20, 2025

Nathan Ochsner, Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § | |
| v. | § § | Criminal No. __4:25-cr-330__ |
| HAROLD SHATZ and EDWARD SHATZ, | § § § § | |
| Defendants. | § § | |

## INFORMATION

The United States Attorney charges:

### General Allegations

At all times material to this Information, unless otherwise specified:

### The Medicare Program

1. The Medicare Program ("Medicare") was a federally funded program that provided free and below-cost health care benefits to individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare & Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

2. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

3. Medicare covered different types of benefits and was separated into different program "parts." Medicare "Part B" covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, such as office

1

visits and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

4. Medicare "providers" included independent clinical laboratories, physicians, and other health care providers who provided items or services to beneficiaries. To bill Medicare, a provider was required to submit a Medicare Enrollment Application Form ("Provider Enrollment Application") to Medicare. The Provider Enrollment Application contained certifications that the provider was required to make before the provider could enroll with Medicare. Specifically, the Provider Enrollment Application required the provider to certify, among other things, that the provider would abide by the Medicare laws, regulations, and program instructions, including the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and that the provider would not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare.

5. A Medicare "provider number" was assigned to a provider upon approval of the Provider Enrollment Application. A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for reasonable and necessary services provided to beneficiaries.

6. A Medicare claim was required to contain certain important information, including: (a) the beneficiary's name and Health Insurance Claim Number ("HICN"); (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; (e) the name of the referring physician or other health care provider; and (f) the referring provider's unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI"). The claim form could be submitted in hard copy or electronically.

7. When submitting claims to Medicare for reimbursement, providers were required to certify that: (a) the contents of the forms were true, correct, and complete; (b) the forms were prepared in compliance with the laws and regulations governing Medicare; and (c) the services that were purportedly provided, as set forth in the claims, were medically necessary.

8. Medicare claims were required to be properly documented in accordance with Medicare rules and regulations. Medicare would not reimburse providers for claims that were procured through the payment of kickbacks and bribes.

## Medicare Coverage for Genetic Testing

9. Cancer genetic ("CGx") testing used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future. Pharmacogenetic tests ("PGx" tests) were laboratory tests that used DNA sequencing to assess how the body's genetic makeup would affect the response to certain medications. CGx and PGx testing, both of which were forms of diagnostic testing, were referred to collectively as "genetic testing." Neither type of genetic testing was a method of diagnosing whether an individual had a disease, such as cancer, at the time of the test.

10. For genetic testing, a beneficiary provided a saliva sample or cheek or nasal swab containing DNA material. The DNA sample was then submitted to a laboratory to conduct CGx or PGx testing. Tests were then run on different "panels" of genes. Genetic testing typically involved performing lab procedures that resulted in billing Medicare using certain billing codes, each with its own reimbursement rate.

11. DNA samples were submitted along with requisitions that identified the beneficiary, the beneficiary's insurance, and indicated the specific type of genetic testing to be performed. In order for laboratories to submit claims to Medicare for genetic testing, the

requisitions had to be signed by a physician or other authorized medical professional, who attested to the medical necessity of the genetic testing.

12. Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." 42 C.F.R. § 411.15(a)(1).

13. If diagnostic testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a) provided: "All . . . diagnostic laboratory tests . . . must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

## Telemedicine

14. Telemedicine provided a means of connecting beneficiaries to health care providers by using telecommunications technology, such as the internet or telephone, to interact with a beneficiary.

15. Telemedicine companies provided telemedicine services, or telehealth services, to individuals by hiring doctors and other health care providers. In order to generate revenue, telemedicine companies typically either billed insurance or received payment from beneficiaries who utilized the services of the telemedicine company.

16. During the relevant time period, Medicare Part B covered expenses for specific telemedicine services if certain requirements were met, including that: (a) the beneficiary was located in a rural or health professional shortage area; (b) services were delivered by an interactive audio and video telecommunications system; and (c) the beneficiary was in a practitioner's office or a specified medical facility—not at a beneficiary's home—during the telehealth service with a remote practitioner.

### The Relevant Entities, Defendants, and Relevant Individuals

17. Access DX Laboratory, LLC ("AccessDX") was a Texas limited liability company with a principal place of business in Harris County, Texas. AccessDX was an independent clinical laboratory enrolled with Medicare that purportedly provided laboratory services and diagnostic testing, including genetic testing, to individuals, including Medicare beneficiaries.

18. New Dawn Laboratories, LLC ("New Dawn") was a Texas limited liability company with a principal place of business in Harris County, Texas. New Dawn was an independent clinical laboratory enrolled with Medicare that purportedly provided laboratory services and diagnostic testing, including genetic testing, to individuals, including Medicare beneficiaries.

19. US Pharmacy Relief ("USPR") was a Nevada corporation with a principal place of business in Los Angeles County, California. USPR operated call centers that marketed to beneficiaries on behalf of health care providers.

20. Company 1 was a Florida limited liability company with a principal place of business in Hillsborough County, Florida. Company 1 operated call centers that marketed to beneficiaries on behalf of health care providers.

21. **HAROLD SHATZ** was a resident of Palm Beach County, Florida, and was

business partners with his brother **EDWARD SHATZ**, John Michael Stewart ("Stewart"), and Individual 1, and was a partial owner of New Dawn. Individual 1 signed the Provider Enrollment Application on behalf of New Dawn.

22. **EDWARD SHATZ** was a resident of Palm Beach County, Florida, and was a business partner with Stewart, **HAROLD SHATZ**, and Individual 1, and was a partial owner of New Dawn.

23. Stewart was a resident of Harris County, Texas, and was the owner of AccessDX and a partial owner of New Dawn. Stewart signed the Provider Enrollment Application on behalf of AccessDX.

24. David Joyner was a resident of Los Angeles County, California, and was the owner of USPR.

25. Individual 1 was a resident of Palm Beach County, Florida, and was a business partner with Stewart, **HAROLD SHATZ**, and **EDWARD SHATZ**, and was a partial owner of New Dawn.

26. Marketer 1 was a resident of Hillsborough County, Florida. Marketer 1 was the owner of Company 1 and worked with Joyner to refer beneficiary samples for diagnostic testing to AccessDX and New Dawn.

### COUNT ONE
**Conspiracy to Defraud the United States and to Pay and Receive Health Care Kickbacks**
**(18 U.S.C. § 371)**

27. Paragraphs 1 through 26 of this Information are realleged and incorporated by reference as though fully set forth herein.

28. From in or around March 2018, and continuing through in or around May 2019, the exact dates being unknown to the United States Attorney, in the Houston Division of the Southern

District of Texas, and elsewhere, the Defendants,

**HAROLD SHATZ and
EDWARD SHATZ,**

did knowingly and willfully combine, conspire, confederate, and agree with others known and unknown to the United States Attorney, including with Stewart, Joyner, Individual 1, and Marketer 1, to commit offenses against the United States, that is:

a. to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of HHS and CMS in its administration and oversight of Medicare;

b. to violate Title 42, United States Code, Section 1320a-7b(b)(1), by soliciting and receiving any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare; and in return for the purchasing, leasing, ordering, and arranging for, and recommending the purchasing, leasing, and ordering of any good, facility, service, and item for which payment may be made in whole and in part by a Federal health care program, that is, Medicare; and

c. to violate Title 42, United States Code, Section 1320a-7b(b)(2), by offering and paying any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind to any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare; and to purchase, lease, order and arrange for and recommend purchasing, leasing, and ordering any good, facility, service, and item for which payment may be made

in whole and in part under a Federal health care program, that is, Medicare.

## Purpose of the Conspiracy

29.     It was a purpose of the conspiracy for **HAROLD SHATZ**, **EDWARD SHATZ**, Stewart, Joyner, Marketer 1, Individual 1, and their co-conspirators, known and unknown, to unlawfully enrich themselves by, among other things: (a) soliciting, receiving, offering, and paying kickbacks and bribes in exchange for the referral of Medicare beneficiaries' DNA samples and arranging for doctors' orders for genetic testing to AccessDX and New Dawn; (b) submitting and causing the submission of claims to Medicare for genetic testing that were procured through kickbacks and bribes, and were otherwise ineligible for reimbursement; (c) concealing and causing the concealment of kickbacks and bribes; and (d) diverting the proceeds for their personal use and benefit, the use and benefit of others, and to further the conspiracy.

## Manner and Means

The manner and means by which **HAROLD SHATZ**, **EDWARD SHATZ**, Stewart, Joyner, and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things, the following:

30.     Stewart falsely certified to Medicare, through a Provider Enrollment Application submitted to Medicare, that he, as well as AccessDX, would comply with all Medicare rules and regulations, and federal laws, including that he would not knowingly present or cause to be presented a false and fraudulent claim for payment by Medicare, and that he would comply with the Federal Anti-Kickback Statute.

31.     **HAROLD SHATZ** falsely certified to Medicare, through a Provider Enrollment Application submitted to Medicare, that he, as well as New Dawn, would comply with all Medicare rules and regulations, and federal laws, including that he would not knowingly present or cause to

be presented a claim for payment by Medicare that was ineligible for reimbursement under Medicare rules and regulations, and that he would comply with the Federal Anti-Kickback Statute.

32. **HAROLD SHATZ, EDWARD SHATZ**, Stewart, and their co-conspirators, through AccessDX and New Dawn, offered to pay, and paid, illegal kickbacks and bribes in the form of percentage commissions to marketers, including Joyner and Marketer 1, in exchange for the ordering and arranging for the ordering of genetic testing for Medicare beneficiaries from AccessDX and New Dawn, knowing that AccessDX and New Dawn would bill Medicare for genetic testing that was purportedly provided on behalf of these beneficiaries and that was predicated on these illegal commissions.

33. In or around early 2018, Marketer 1 and Joyner reached an agreement with **HAROLD SHATZ** and **EDWARD SHATZ**, who were acting on behalf of AccessDX and Stewart, to refer DNA samples and doctors' orders for CGx and PGx testing to AccessDX in exchange for an approximately forty percent kickback on reimbursement amounts, which was to be split equally between Marketer 1 and Joyner.

34. **HAROLD SHATZ**, **EDWARD SHATZ**, Stewart, Joyner, and Marketer 1 knowingly and intentionally disguised the nature and source of these illegal kickbacks and bribes by concealing percentage commissions through sham contracts and otherwise making them look like they were for legitimate hourly services.

35. **HAROLD SHATZ**, **EDWARD SHATZ**, Stewart, and their co-conspirators, including Joyner and Marketer 1, agreed that Joyner and Marketer 1 would pay purported telemedicine providers to obtain signed doctors' orders for CGx and PGx testing. Joyner, Marketer 1, and others known and unknown, targeted and recruited beneficiaries through telemarketing campaigns to induce them to submit DNA samples for CGx and PGx testing.

36. Joyner and Marketer 1 solicited and received kickbacks and bribes from **HAROLD SHATZ, EDWARD SHATZ**, and Stewart in exchange for DNA samples and doctors' orders for CGx and PGx testing, knowing that AccessDX and New Dawn would bill Medicare for genetic testing purportedly provided on behalf of these beneficiaries.

37. **HAROLD SHATZ, EDWARD SHATZ**, and Stewart caused kickback and bribe payments described above to be transmitted to Joyner and Marketer 1, by check and interstate wire, from bank accounts held in the name of AccessDX and New Dawn, to bank accounts held in the name of Company 1 and USPR.

38. **HAROLD SHATZ, EDWARD SHATZ**, Stewart, Joyner, Marketer 1, and their co-conspirators created and transmitted sham invoices and spreadsheets reflecting the kickback and bribe payments described above owed by AccessDX and New Dawn, and used email and other forms of communications, to inform each other of Medicare reimbursements, the payment of kickbacks and bribes, and other matters related to the scheme.

39. **HAROLD SHATZ**, **EDWARD SHATZ**, Stewart, and their co-conspirators paid and caused the payment of illegal kickbacks and bribes described above in exchange for Medicare beneficiary DNA samples and signed doctors' orders for genetic testing referred by Joyner and Marketer 1.

40. **HAROLD SHATZ**, **EDWARD SHATZ**, Stewart, Joyner, and their co-conspirators used the proceeds received from Medicare to benefit themselves and others, and to further the scheme.

## Overt Acts

In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed, in the Houston Division of the Southern

District of Texas, and elsewhere, at least the following overt acts, among others:

41. On or about May 10, 2019, Individual 1 emailed Joyner and Marketer 1, copying **HAROLD SHATZ** and **EDWARD SHATZ**, regarding amending diagnosis codes on requisition forms for beneficiaries solicited for genetic testing.

42. On or about May 17, 2019, Marketer 1 had a phone call with **HAROLD SHATZ** and Individual 1 in which they discussed how Marketer 1 and **HAROLD SHATZ** and his business partners would proceed with responding to a Medicare audit of New Dawn; how they would document Marketer 1's business arrangement with **HAROLD SHATZ** and his business partners; and how they would proceed with Marketer 1 sending DNA samples and acquiring doctor's for genetic testing.

All in violation of Title 18, United States Codes, Section 371.

## NOTICE OF CRIMINAL FORFEITURE
### (18 U.S.C. § 982(a)(7))

53. Pursuant to Title 18, United States Code, Section 982(a)(7), the United States of America gives notice to **HAROLD SHATZ** and **EDWARD SHATZ**, that, upon conviction of Count One, all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such offenses is subject to forfeiture.

### Money Judgment and Substitute Assets

54. Defendants **HAROLD SHATZ** and **EDWARD SHATZ** are notified that upon conviction, a money judgment may be imposed against them. In the event that one or more conditions listed in Title 21, United States Code, Section 853(p) exists, the United States will seek to forfeit any other property of the Defendants up to the amount of the money judgment.

UNITED STATES OF AMERICA, by

        NICHOLAS J. GANJEI
        UNITED STATES ATTORNEY

        LORINDA LARYEA
        ACTING CHIEF, FRAUD SECTION

        *Andrew Tamayo*
        _____
        ANDREW TAMAYO
        MONICA COOPER
        TRIAL ATTORNEYS
        FRAUD SECTION, CRIMINAL DIVISION
        U.S. DEPARTMENT OF JUSTICE